**UNITED STATES of America,**
**Plaintiff,**

v.

**CONSOLIDATED PRODUCTIONS, INC.**
**and Thomas S. Tierney,**
**Defendants.**

**Crim. No. 6883–F–CD.**

United States District Court,
C. D. California.

April 30, 1971.

Robert L. Meyer, U. S. Atty., David R. Nissen, Asst. U. S. Atty., Chief, Criminal Division, David H. Anderson, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff.

Vars, Reff & White, Robert J. Vars, Sherman Oaks, Cal., for defendants.

## MEMORANDUM OPINION GRANTING MOTION TO DISMISS THE INDICTMENT

FERGUSON, District Judge.

The indictment in this case involves the first criminal prosecution instituted for an alleged violation of 39 U.S.C. § 4009 (1964 ed., Supp. IV). That section provides that a person who has received by mail an "advertisement which offers for sale matter which the addressee in his sole discretion believes to be erotically arousing or sexually provocative" may request the Postmaster General to issue an order "directing the sender and his agents or assigns to refrain from further mailings to the named addressee" and to delete the addressee's name from his mailing lists. It further provides that the United States District Court has "jurisdiction, upon application by the Attorney General, to issue an order commanding compliance with" the Postmaster General's order. A violation of that court "order may be punished by the court as contempt thereof".

On April 13, 1970, a judgment was entered against Consolidated Productions, Inc., doing business as Adult Novelty Company, in this United States District Court pursuant to 39 U.S.C. § 4009(e). This judgment provided in pertinent part as follows:

> "IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the defendant comply with the Prohibitory Order issued by the Postmaster General on May 8, 1969, that the defendant refrain from further mailings to WHITEHURST PAVING COMPANY at 2800 Deep Water Terminal Road, Richmond, Virginia 23206, and that defendant remove said name from its mailing lists;".

Thereafter, on June 16, 1970, Whitehurst Paving Company received an additional mailing from Consolidated Productions, Inc. (this time doing business as Cinema Products).

The government then brought this indictment in three counts, pursuant to 18 U.S.C. § 401. This section provides that:

> "A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—
>
> \* \* \* \* \* \*
>
> (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

The first count was against Consolidated Productions, Inc., doing business as Adult Novelty Company, alleging that it had "unlawfully, willfully, and knowingly" mailed an unsolicited advertisement to Whitehurst Paving Company, thereby disobeying the court's order. The corporate defendant pleaded guilty and was fined $2,500. The remaining two counts involve the same allegations but are

against Thomas S. Tierney, as the president of Consolidated Productions, Inc., and as an individual.

The parties stipulated to the following relevant facts: (1) On April 13, 1970, judgment was entered against defendant Consolidated Productions, Inc. in the district court, ordering the corporate defendant, plus its agents or assigns having actual knowledge of said judgment, not to make any further mailings to Whitehurst Paving Company; (2) defendant Tierney acquired personal knowledge of the entry of that judgment on or before May 15, 1970; and (3) defendant Tierney had no knowledge of the mailing which was sent to Whitehurst Paving Company and received by the addressee on June 16, 1970.

Pursuant to Rule 12 of the Federal Rules of Criminal Procedure, the defendant has made a motion to dismiss, and asserts two arguments in support thereof:

(a) That as a matter of law, he cannot be found guilty of criminal contempt under the stipulated facts of this case, i. e., that defendant had no knowledge of, and therefore could not have had any "knowing and willful intent" to commit the alleged disobedient act.

(b) That to strike or disregard the allegation in the indictment that the defendant "willfully and knowingly" disobeyed the court's order would render the indictment fatally insufficient for having failed adequately to inform the defendant of the nature of the charges against him.

Both parties rely heavily upon Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). In *Morissette*, the Court held that criminal intent was an essential element of an offense under 18 U.S.C. § 641, which provides that "whoever embezzles, steals, purloins, or knowingly converts" property of the United States commits a crime. The Court noted that while Congress had omitted any express prescription of criminal intent, it had done so in light of an "unbroken course of judicial deci-

sion * * * holding intent inherent in this class of offense". And it found nothing in the history and purposes of the statute to imply an affirmative act by Congress to remove intent as a requirement.

In reaching this conclusion, the court noted that in certain "public welfare offenses" which were not common law crimes the Court had construed mere omission from a criminal enactment of any mention of criminal intent as dispensing with it. *See, e. g.*, United States v. Behrman, 258 U.S. 280, 42 S. Ct. 303, 66 L.Ed. 619 (1922); United States v. Balint, 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922). The Court reasoned, however, that:

"[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed." 342 U.S. at 263, 72 S.Ct. at 250.

This language was quoted with approval in United States v. Freed, 401 U.S. ——, 91 S.Ct. 1112, 28 L.Ed.2d 356 (April 5, 1971). Thus, where Congress uses a term of art in a statute there is a presumption that it retains its traditional meaning absent some contrary expression of congressional intent, either explicit or implied from the history and purposes of the statute.

The origin of the offense of contempt can be traced back to early English jurisprudence. A court has traditionally had the power to punish for contempt either to vindicate its dignity for disrespect shown to it or its orders, or to compel the performance of some order or decree whose performance is within the power of the party held in contempt. Contempt is divided into two categories —criminal and civil—although attempts to draw a definitional line between criminal and civil contempt have met with

considerable conceptual difficulty. *See generally* Goldfarb, The Contempt Power 49–67 (1963).

■■ The basic distinction between criminal and civil contempt is the nature of the relief requested and the purpose for it. The same sanctions, fine and imprisonment, are imposed for both, but in civil contempt they are employed "as coercive sanctions to compel the contemnor to do what the law made it his duty to do". Penfield Co. v. Securities and Exchange Commission, 330 U.S. 585, 590, 67 S.Ct. 918, 921, 91 L.Ed. 1117 (1947). The relief granted in civil contempt proceedings must be either conditional to induce the contemnor to comply with the court's order, or compensatory to reimburse the other party for losses or damages sustained by reason of the noncompliance. Thus the proceeding is civil if the purpose is remedial and intended to coerce the person into doing what he is supposed to do. The proceeding is one for criminal contempt when the purpose is to vindicate the authority of the court by punishing the wrongdoer.

■ A second difference is that while willfulness need not be proved to establish civil contempt, McComb v. Jacksonville Paper Co., 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949), willful disobedience is an essential element of criminal contempt, and intent must be proved beyond reasonable doubt. *See* United States v. United Mine Workers, 330 U.S. 258, 303, 67 S.Ct. 677, 91 L.Ed. 884 (1947); In re Floersheim, 316 F.2d 423, 428 (9th Cir. 1963); Yates v. United States, 316 F.2d 718, 723 (10th Cir. 1963); MacNeil v. United States, 236 F.2d 149, 152 (1st Cir. 1956).

In *Morissette*, the Supreme Court held that when Congress uses a traditional term of art in a new statutory context, the courts must give that term of art its traditional meaning unless there is some contrary indication by Congress, either explicit or implied, from the history and purposes of the statute.

In providing for enforcement of the court's order under § 4009(e), Congress provided that a violation thereof would be punished as contempt. This court must presume that in adopting this term of art—"contempt"—Congress intended the courts to give it its traditional meaning absent some contrary indication. It appears that the government adopted the same reasoning when it initiated prosecution in this case. First, the indictment was brought, not under the new § 4009, but rather under 18 U.S.C. § 401, the traditional contempt statute. Second, the indictment alleges that the defendant "willfully and knowingly" caused the material to be mailed.

Section 4009(e) basically provides that the district courts shall have jurisdiction to order compliance with the Postmaster General's order. With regard to sanctions, it simply states that "[f]ailure to observe such order may be punished by the court as contempt thereof". The congressional history of this bill merely indicates that violation of the court's order was to be punished as "contempt of court". *See* Appendix A. As such, the sponsor of the amendment concluded that: "The court sets the punishment." Nothing in the history of § 4009(e) indicates a congressional intent to modify the court's traditional contempt powers.

■ While it is always difficult for a court to inquire into the purposes of a particular statute, it seems clear that the basic purpose of this statute was to provide a procedure whereby an individual householder could choose not to receive further mailings from a particular sender and thereby "insulate himself from advertisements that offer for sale 'matter which the addressee in his sole discretion believes to be erotically arousing or sexually provocative' ". Rowan v. U.S. Post Office Department, 397 U.S. 728, 730, 90 S.Ct. 1484, 1487, 25 L.Ed.2d 736 (1970). 113 Cong.Rec. 28660 (1967) (Remarks of Congressman Waldie); 113 Cong.Rec. 34231 (1967) (Remarks of Senator Monroney). Traditional doctrines of contempt provide an effective

method of achieving this result, and these doctrines are not inconsistent with such a purpose.

■ In a case such as this the government could have proceeded in civil contempt where a showing of willful disobedience or intent is not required. In such a proceeding, this court would have had the power to imprison Mr. Tierney until he complied with the court order, and to assess a remedial fine to compensate the plaintiff not only for damages resulting from the disobedience of the order, but also for expenses incurred in the enforcement thereof. Such a civil proceeding would accomplish the result envisioned by Congress when it adopted § 4009—the householder would have a method whereby he could fully insulate himself from further mailings by a particular sender. Alternatively, the government can institute a prosecution for criminal contempt whenever the evidence in a particular case supports a finding of willful disobedience. It should be noted that where intent is an essential element of an offense, it is a well established rule that intent may be inferred from the facts and circumstances of the case.

■■ Nevertheless, the facts of this case make it clear that this is not a proper case for criminal contempt. Both parties *stipulate* that the defendant Tierney did not have knowledge of the mailing in question. This conclusion is also compelled by the traditional rule that the power to punish for contempt should be exercised sparingly. Western Fruit Growers v. Gotfried, 136 F.2d 98, 101 (9th Cir. 1943). Thus a court, in dealing with contempt, must exercise "[t]he least possible power adequate to the end proposed". Shillitani v. United States, 384 U.S. 364, 371, 86 S.Ct. 1531, 1536, 16 L.Ed.2d 622 (1966); Taylor v. Finch, 423 F.2d 1277, 1279 (8th Cir. 1970).

■ While the facts of this case are such that a civil contempt proceeding would seem proper, the instant prosecution is solely a proceeding in criminal

contempt, and fairness requires that the court consider itself so limited. It has been processed as such procedurally, and is so understood by both parties. In addition, the court feels that it is "the better practice to try criminal contempt alone and so avoid obscuring the defendant's privileges in any manner". United States v. United Mine Workers, 330 U.S. 258, 299, 67 S.Ct. 677, 699, 91 L.Ed. 884 (1947).

■ The government argues that this is a *mala prohibita* offense—one that was not a crime at common law—and therefore does not require intent or actual knowledge on the part of the individual corporate officer. However, this is a proceeding in criminal contempt arising out of the alleged violation of a court order. Such disobedience is, and was at common law, the subject of criminal contempt. The fact that Congress, pursuant to § 4009, granted this court jurisdiction to enter certain orders concerning postal mailings does not change the nature of the court's contempt powers under 18 U.S.C. § 401.

The government then refers to numerous other decisions which "have upheld the right of Congress to impose criminal sanctions upon officers of corporations which violate the law, even though the officers cannot be shown to have actual knowledge of the particular violations". This is true. The issue presented here is not whether Congress can do this, but whether Congress chose to do so when it enacted § 4009.

Finally, the government argues that the legislative intent of Congress was to eliminate the necessity of showing that the defendant intentionally violated the court order or even had knowledge of the violative mailing. In support of this conclusion, the government refers to two items: (1) language in 39 U.S.C. § 4009(b) and (c) which refers to the sender plus "his agents or assigns"; (2) testimony reflecting congressional concern with the problem of fly-by-night companies. The government then argues that, unless the statute is con-

strued to dispense with the requirement of intent or actual knowledge on the part of the corporate officer, an individual defendant could hide behind the shield of a corporate entity that has no assets. This argument ignores the obvious alternative of a civil contempt proceeding against the individual officer, which, as discussed above, would fully accomplish the purpose of the statute.

For the reasons discussed above, this court must conclude that an essential element of criminal contempt is intent, *i. e.*, there must be a willful disobedience of the court's order. Since the stipulated facts of this case establish that the defendant Tierney had no knowledge of, and therefore could not have had any knowing and willful intent to commit the alleged disobedient act, defendant's motion to dismiss must be granted. This dismissal is, of course, without prejudice to any future civil contempt proceeding which might be instituted.

It is, therefore, ordered that Counts 2 and 3 of the indictment, as they relate to the defendant Thomas S. Tierney are dismissed.

### APPENDIX A

The following comments are the only ones found which relate to the penalty intended by 39 U.S.C. § 4009(e):

"Mr. JONES of Missouri. What is the penalty for the mailer, after he has been notified to take your name off the list and withdraw it? Would the provisions of your amendment withdraw his mailing privilege from then on?

"Mr. WALDIE. No. In one of the amendments that is being considered on the floor, that is the penalty. The penalty in my amendment is precisely the penalty that the gentleman from Nebraska [Mr. CUNNINGHAM] wants.

"Mr. JONES of Missouri. Well, what is the penalty?

"Mr. WALDIE. It is punishment for contempt if the mailer refuses to obey the order of the court.

"Mr. JONES of Missouri. Well, if the gentleman will yield further, who assesses the punishment?

"Mr. WALDIE. The court sets the punishment.

"Mr. JONES of Missouri. In other words, he could get the matter into court and keep operating for a period of 10 years while the matter is being decided and thus delayed?

"Mr. WALDIE. No; he could not, because there is an injunction that prohibits him from mailing the material. He can go to court and seek to have the injunction lifted. But if he has mailed material in violation of the order of the Postmaster General and then the Postmaster General seeks an injunction and obtains it, if the mailer fails to abide by that injunction, then he can be held in contempt of court and would be subject to the penalties provided for herein.

\*   \*   \*   \*   \*   \*

"Mr. CUNNINGHAM. \* \* \*

"Mr. Chairman, what this simply says is that if you or your minor child receives some of this obscene, sexually provocative advertising—pandering advertising—by having it dropped into your mailbox—either you or your minor child—you have the right to petition the Postmaster General saying that you do not want any more of this type of mail brought into your home and to notify the sender to remove your name from his list. Then the Postmaster General is to notify the mailer to take your name off the list, or any other list on which he is connected through interchange of mailing lists. If the sender does not do it, the Postmaster General is empowered to take this matter to the Justice Department, and they in turn are empowered to take this matter to the U. S. district court and ask for a cease-and-desist order.

"If the mailer then continues to send you additional mail, he is subject to contempt-of-court proceedings." 113 Cong.Rec. 28660 (1967).